| | | |
|---|---|---|
| BOYD SMITH, NANCY SMITH, JOEY SMITH, JEFFREY SMITH, JILL SMITH, BESSIE HACKNEY, WILLIAM GRAY, PEGGY GRAY, GREGORY HOUSTON, ERNEST NICELY, and PATRICIA NICELY, for themselves and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs | ) | |
| v. | ) | No.  3:04-cv-591 |
| FIRST CENTURY BANK, CONNIE DYER, SHERI LAWSON, and DELORIS GRAVES, | ) ) ) | |
| Defendants | ) | |
| and | ) | |
| FIRST CENTURY BANK, | ) | |
| Counter-Plaintiff | ) | |
| v. | ) | |
| BOYD SMITH, NANCY SMITH, JOEY SMITH and JEFFREY SMITH, | ) ) | |
| Counter-Defendants | ) | |

## MEMORANDUM OPINION

This putative class action was filed as the result of allegedly fraudulent activity by defendant First Century Bank (FCB) and three of its current or former employees, defendants Connie Dyer, Sheri Lawson, and Deloris Graves.[1] This matter is presently before the court on plaintiffs' request for class certification set forth in their complaint [*see* Doc. 1, p.22]. The issues raised have been exceptionally well-briefed by the parties [*see* Docs. 41, 45, 46, 47, and 48][2], and oral argument was heard on July 12, 2005.[3] For the reasons that follow, plaintiffs' motion for class certification will be denied.

---

[1]This lawsuit originally named another of FCB's former employees, Karen Williams, as a defendant; however, pursuant to a memorandum opinion [Doc. 42] and order [Doc. 43] filed on July 6, 2005, the court granted this defendant's motion to dismiss so that she is no longer a party to this litigation.

[2]The court would specifically commend counsel for plaintiffs and counsel for FCB for their outstanding briefs.

[3]The court also addressed plaintiffs' joint motion to consolidate this case [*see* Doc. 38] with the case of *Ernest and Patricia Nicely v. First Century Bank, et al.*, 3:05-cv-175 [*see* Doc. 20], presently pending before the Honorable R. Leon Jordan, United States District Judge. In view of the common questions of law and fact in those two cases, *see* Fed.R.Civ.P. 42(a), and in further view of the fact that the only party who had any objection to a consolidation, Karen Williams, is no longer a party to this litigation, the undersigned recommended to the Honorable R. Allan Edgar, Chief United States District Judge, that these matters be consolidated and that Judge Jordan's case be reassigned accordingly. The record reflects that Judge Edgar entered an appropriate order of consolidation and reassignment on July 18, 2005 [*see* Docs. 50 and 21, respectively].

2

# I.

## *Introduction*

The class of plaintiffs for whom this action is filed is specifically described as follows:

> All customers of the Union County branch of [FCB] whose identities and/or financial information were used by employees or representatives of [FCB] without permission to issue loans, obtain credit, transfer funds, transfer property interests, and for other financial transactions during the period from January 1, 1998 to the present.

[Doc. 1, p.2]. The putative class seeks compensatory, punitive and statutory damages as well as injunctive and equitable relief pursuant to federal and state law as follows:

> 1. Violations of the Racketeer Influenced and Corrupt Organizations Act (Civil RICO), 18 U.S.C. §§ 1961, *et seq.* (Count I);
>
> 2. Violations of the federal Consumer Credit Protection Act, 15 U.S.C. § 1681s-2 (Count II);
>
> 3. Violations of federal statutes and regulations for protection of confidentiality of consumer information (Count III);
>
> 4. Violations of the Tennessee Identity Theft Deterrence Act of 1999, T.C.A. §§ 47-18-2101, *et seq.* (Count IV);

3

5. Violations of the Tennessee Consumer Protection Act (TCPA), Tennessee Code Annotated §§ 47-18-101, *et seq.* (Count V);

6. Violations of the Tennessee Financial Records Privacy Act, Tennessee Code Annotated §§ 45-10-101, *et seq.* (Count VI);

7. Breach of fiduciary duty (Count VII);

8. Conversion (Count VIII); and

9. Negligence (Count IX).[4]

## II.

### *Plaintiffs' Allegations*

In support of their request for class certification, plaintiffs emphasize the following allegations in their complaint:

(1) During the period from January 1, 1998 through August 2004, the individual defendants and other representatives of FCB, whose names are unknown at this time, forged the signatures of FCB customers, notarized forged signatures of FCB customers, and otherwise without permission used the identities and confidential information of customers of the Union County Branch of FCB to fraudulently obtain loans, obtain credit, obtain funds, transfer funds, transfer property interests, and convert assets of plaintiffs and other FCB customers [*see* Doc. 1, ¶ 19].

---

[4]Count X seeks equitable relief only and therefore does not allege a particular cause of action.

(2)    FCB knew or should have known of the fraudulent activities of its representatives and employees but did not take action to stop the fraudulent activities and did not take action to protect its customers [*see id.*, ¶ 21].

(3)    FCB made negative information reports to consumer credit agencies about its customers based upon the fraudulent transactions, without verifying the accuracy of the information reported [*see id.*, ¶ 22].

(4)    In 2004, FCB investigated the activities of defendant Connie Dyer and other employees; however, FCB took no action to protect its customers, concealed the fraudulent activity from its customers, failed to return all of the funds and other assets transferred and/or taken from its customers, failed to correct false reports to creditors and credit agencies resulting from the fraudulent activities of its employees, refused to cancel and/or correct loans from FCB that were determined to be false and/or fraudulent, failed to record corrective deeds to correct the fraudulent property transfers, and attempted to force FCB customers to sign a release of all claims against it in order to receive reimbursement of funds taken from them and correction of their financial records [*see id.*, ¶ 24].

(5)    When FCB customers met with FCB representatives to discuss problems with loan documents, these representatives physically concealed the documents from the customers by partially covering the documents with their hands or paper so that the customers could only see their forged signatures but could not determine the nature of the documents [*see id.*, ¶ 38].

(6)    FCB failed to implement and follow security procedures, failed to protect the confidentiality of consumer information, failed to guard against misuse of that information, and failed to detect, report, and stop suspicious activities of its employees [*see id.*, ¶ 61].

(7)    FCB was negligent and failed to exercise the appropriate standard of care in hiring its employees and

5

representatives who engaged in the fraudulent activities [*see id.*, ¶ 90].

(8)    FCB was negligent in its supervision of its employees and representatives who engaged in the fraudulent activity [*see id.*, ¶ 91].

(9)    FCB was negligent in its retention of its employees who engaged in the fraudulent activity after receiving notice of those activities or information that should have put FCB on notice to investigate the problem [*see id.*, ¶ 92].

(10)    The class members need to know the full scope and extent of each forgery or fraudulent transaction made using their respective identities in order to fully address the problem of correcting the credit histories and the titles to their real and personal property [*see id.*, ¶ 96].

(11)    Many of the class members have not yet discovered the forgeries and fraudulent transactions made using their identities [*see id.*, ¶ 97].

(12)    The class members will be irreparably harmed if they do not receive full disclosure and complete information concerning the forgeries and fraudulent transactions made using their identities, as well as the full scope of the transfer and conversion of their funds and properties [*see id.*, ¶ 99].

(13)    In the absence of a class action, most members of the class would find the cost of litigating their claims against these defendants to be too great and would have no effective remedy at law [*see id.*, ¶ 33].

In further support of their request for class certification, plaintiffs point out that one of the important purposes of this lawsuit is to obtain the following injunctive or equitable relief from the court on behalf of all class members:

6

(1)     An order from the court requiring FCB to notify each of its customers during the period from 1998 to the present of the discovery of forgeries and identity theft by FCB employees and to make all records concerning each customer available for inspection by that customer so that the customer can determine for himself or herself whether any forgeries or fraudulent transactions using that customer's identity or information have occurred [*see* Doc. 1, ¶ 100];

(2)     An order from the court requiring FCB to obtain and provide, free of charge, to each customer who claims that a fraudulent activity occurred, a credit report for that customer from a reputable credit reporting agency so that the customer can determine whether any false credit reports were made due to fraudulent transactions using that customer's identity [*see id.*, ¶ 101];

(3)     An order from the court on behalf of each FCB customer for whom it is determined that the customer's identity and/or financial information was used by employees or representatives of FCB without permission to issue loans, obtain credit, transfer funds, and for other financial transactions (that is, the class) requiring FCB to send a letter to the principal credit reporting agencies generally notifying those agencies of the fact that the customer was a victim of identity theft and fraud which may have resulted in an incorrect negative report in the customer's credit history and specifically notifying the agencies of particular notations or reports that are false [*see id.*, ¶ 102];  and

(4)     An order from the court requiring FCB to pay for a title examination of each class member's real property and to prepare and record, at no cost to the class member, corrected deeds and documents to correct each false, forged, or otherwise fraudulent document that has been recorded [*see id.*, ¶ 103].

7

III.

***FCB's Position***[5]

In response to the allegations set forth in the complaint, FCB has filed an answer and has also filed a counter-claim against some of the plaintiffs. More specifically, FCB has sued Boyd and Nancy Smith, jointly and severally, for more than $108,000, Nancy Smith for another $12,500, Joey Smith for more than $44,000, Jeffrey Smith for more than $24,000, Ernest and Patricia Nicely, jointly and severally, for $21,500, Ernest Nicely for an additional amount of more than $14,000, and Patricia Nicely for an additional amount of more than $19,000.[6]

In support of its position that the petition for class certification should be denied, FCB has filed the affidavit of its internal auditor and compliance officer, Joyce Love [*see* Doc. 45, attachment]. In her affidavit, Ms. Love testifies verbatim in pertinent part as follows:

---

[5]Defendants Deloris Graves and Sheri Lawson have adopted the position of FCB as set forth in its brief [*see* Docs. 46 and 47, respectively]. Defendant Lawson also filed a supplemental brief, the primary purpose of which was to distinguish two cases tendered to the court by plaintiffs during oral argument on July 12, 2005 [*see* Doc. 48]. The court agrees with Ms. Lawson's analysis of these two cases.

[6]The record also reflects that the Smith counter-defendants have filed an eight-page answer to the counter-claim, denying many of FCB's allegations [*see* Doc. 24]; however, the Nicely counter-defendants have filed no answer to the counter-claim, even though it was filed on April 25, 2005 [*see* Doc. 10 in 3:05-cv-175].

8

. . .

2.     Defendant Connie Dyer was the assistant branch manager, and later branch manager, of the Maynardville branch of the bank, and had authority to make loans.  It appears that Ms. Dyer engaged in a number of irregular transactions, including creation of loans of which the purported borrowers had no knowledge and the moving of funds into and out of customers' accounts without their knowledge.  The bank was unaware that the loans were fraudulent, and reported the loans to credit reporting agencies as loans taken out by the customers.  The bank discovered the problem in July, 2004, when a customer contacted the bank about questionable information Connie Dyer had given her on her account.  When the bank discovered irregularities in Ms. Dyer's dealings with the customer's account, the bank launched a full-scale investigation, under my supervision.  At that time, Ms. Dyer resigned from her employment with the bank.

3.     Acting under my supervision, bank employees contacted all customers who had open loans in Connie Dyer's loan portfolio, which consisted of 495 loans, and all customers who had open loans in Defendant Deloris Graves' loan portfolio, which consisted of 252 loans.  Ms. Graves was the branch manager until February, 2004 and was the only other person at the branch with authority to make loans.  For each loan, the bank mailed to the borrower a loan confirmation form stating the loan number and current balance, and asking the borrower to [inform] the bank of any questions or discrepancies by describing them in a space provided on the form and returning the form to the bank.  The loan confirmation forms were first mailed to all borrowers in August, 2004.  In September and October of 2004, a second round of confirmation forms were mailed to the borrowers who had not yet responded to the first mailing.

4.     Of the 747 loan confirmation forms sent, 590 were returned.  When a borrower raised questions about his or her loans, the bank reviewed the loan documents

9

and related transactions and met with the borrower. Thirty-six borrowers asserted that unauthorized loans or transactions had occurred. The bank obtained affidavits from most of those borrowers confirming that the loans or other transactions were unauthorized. The bank then forgave all unauthorized loans, corrected the unauthorized transactions, returned any funds owing to the borrower, and notified all credit reporting agencies to remove the unauthorized loans from the borrower's credit report.

5.    Borrowers did not return confirmation forms for 157 of the loans. Of those loans, 85 have since been paid in full by the borrowers, renewed or charged off. Borrowers are still making payments on an additional 67 loans. Another three unreturned confirmation forms were sent to plaintiffs Nancy Smith, Jill Smith and Greg Huston [sic].

6.    Under my supervision, bank employees also mailed a confirmation form and an account statement to each customer who had a "Mighty Oak" Savings Account with the bank. Those accounts had larger balances than other savings accounts, received only quarterly statements and seemed to have been used by Ms. Dyer in some irregular transactions. As with the loans, the confirmation form asked the customers to note any discrepancies or questions on the form and to return the form to the bank. The bank sent the confirmation forms to the holders of 209 Mighty Oak accounts in August, 2004. In September, 2004, the bank sent another confirmation form and account statement to each account holder who had no responded to the previous notice. Of the 209 forms sent, 163 were returned. When a customer asserted that there were discrepancies, the bank reviewed the transactions and met with the customer. Seven customers asserted that unauthorized transactions had occurred. The bank obtained affidavits from those customers confirming that the transactions were unauthorized. The bank then corrected the transactions and returned any funds owing to the customers. Of the 46 accounts for which confirmation forms were not returned, 5 have been closed with no complaint from the customer. Each customer has received

10

three quarterly account statements since the bank sent its second confirmation form.

7.      When a customer has claimed fraud, the bank has asked the customer to sign a sworn affidavit stating that the loan or other transaction was unauthorized. Based on such affidavits, as of early this year the bank had reimbursed or paid out in excess of $583,000.00 to make up fraud losses.  The bank has made up all of the fraud losses it has discovered to date, including all losses suffered by plaintiffs, with the possible exception of one of the claims made by plaintiffs William and Peggy Gray, discussed later in this affidavit.  The bank also has corrected the credit reports for 27 customers.  The bank has not corrected some credit reports relating to some of the plaintiffs.

8.      In addition to the complaints from the plaintiffs in this case, the bank has received complaints about unauthorized transactions from Ernest and Patricia Nicely.[7] The Nicelys received and returned the loan confirmation forms sent to them by the bank, and met with bank representatives, including myself, to discuss their questions concerning their loans.

9.      As soon as it discovered possible fraudulent activity, the bank reported the matter to the FBI, FDIC and the Tennessee Department of Financial Institutions.  The bank has been cooperating fully with the FBI in its investigation of this matter.

10.      It is my understanding from discussions with the plaintiffs and from common knowledge in the community that all of the plaintiffs are related to one another and to Connie Dyer.  Boyd Smith and Nancy Smith are husband and wife.  Joey Smith, Jeffrey Smith and Jill Smith are their children.  Bessie Hackney is Nancy Smith's mother.  Peggy Gray is Nancy Smith's sister.  Gregory Houston is a nephew of Peggy Gray and Nancy Smith.  Connie Dyer is

---

[7]As discussed earlier, the Nicelys are now plaintiffs in this case.

a cousin to Boyd Smith and the niece of William Gray, who is Peggy Gray's husband.

11. All of the plaintiffs had some loans that they allege were fraudulently created by Connie Dyer. However, none of the plaintiffs has lost any money from their accounts at the bank, with the possible exception of William and Peggy Gray, discussed later in this affidavit. The Smith family has received large sums of money wrongfully taken from the bank, as set forth in the bank's Counterclaim against the Smiths. The bank's records show that Boyd and Nancy Smith have received at least $108,310.05 in funds that were taken from the bank by Connie Dyer, including payoffs of legitimate loans owed by Boyd and Nancy Smith. Their son, Joey Smith, had a truck loan and a boat loan from the bank that were not on the bank's books and were paid off with money taken by Ms. Dyer in the amount of at least $44,263.98. Their son, Jeffrey Smith, also had a truck and boat loan not on the books and paid off with funds taken by Ms. Dyer in the amount of at least $24,000.71. Mr. and Mrs. Smith have met with bank representatives to discuss their loans and other transactions, but have refused to meet further with the bank to review the results of the bank's investigation of their loans, and have not given the bank the affidavits, like those given by other customers, stating that any of their loans or transactions were unauthorized.

12. Nancy and Boyd Smith were consistently overdrawn in their bank accounts, and it appears that loans were created in their names to cover overdrafts. Ms. Dyers has admitted to me and to other bank employees that she engaged in manipulation of accounts under pressure from Nancy Smith, who needed money.

13. Plaintiff Jill Smith's credit report has been corrected by the bank, to remove any reference to a loan that may have been unauthorized.

14. Plaintiff Bessie Hackney has asserted that several loans were fraudulently created in her name, and

12

has signed affidavits to that effect. In meetings with myself and other bank employees, she admitted to having two legitimate loans. All loans have been removed from her credit report except for the two loans she admitted were legitimate.

15.     Gregory Houston had a number of loans in his name at the bank, most of which have been paid off, and some of which he has claimed were fraudulent. He has not lost any money through fraud. His credit report has not been corrected, because he has refused to sign an affidavit stating that the loans were fraudulent.

16.     William and Peggy Sue Gray have not lost any money from fraudulent loans, although fraudulent loans may have been created in their names. Mr. Gray claims that he lost in excess of $70,000.00 in proceeds of the CD. He claims that he initially deposited $40,000.00 to buy his first CD, which has been repeatedly renewed. The bank's records show that his first CD was opened in 1989 in the amount of $26,000.00. Mr. Gray has produced no proof that he made a deposit in the amount of $40,000.00. The bank's records show that the $26,000.00 CD was renewed several times and for a time was converted into a savings account and then back into a CD. Ultimately, in 1999, the CD was cashed in for $43,300.46, of which $25,000.00 was deposited to the account of Boyd Smith;  $8,932.85 was converted to a cashier's check payable to Mr. Gray, of which $800.00 was paid on a loan in the name of Mr. Gray; and $9,367.61 was used to pay off a loan in Mr. Gray's name, supposedly for the purchase of a tractor. However, Mr. Gray has admitted to me and to other bank employees that the money represented by the CD is not his, but is his mother's money, which was put in his name so that his mother could obtain benefits from the federal government. Mr. Gray has also admitted to me and to other bank employees that he asked Ms. Dyer to transfer the CD funds from his name to the names of Ms. Dyer's children so that his wife, plaintiff Peggy Gray, could obtain benefits from the federal government.

13

. . .

[Doc. 45, attachment].

## IV.

### *Law and Analysis*

In order to obtain class certification, plaintiffs must establish each of the following threshold requirements:  (1) the class must be so numerous that joinder of all members is impracticable;  (2) there must be questions of law or fact common to the class;  (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;  and (4) the representative parties must fairly and adequately protect the interest of the class.  Fed.R.Civ.P. 23(a).  These four requirements, or prerequisites, have been given the shorthand designations of numerosity, commonality, typicality, and adequacy of representation.  *See, e.g., Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002).  Even if plaintiffs can satisfy the four prerequisites for class certification found in Rule 23(a), plaintiffs must also show that they satisfy one of the three types of class actions found in Fed.R.Civ.P. 23(b).  However, because the court finds that plaintiffs have failed to meet any of the threshold requirements, it will not be  necessary to analyze whether these plaintiffs satisfy one of the three types of class actions found in Rule 23(b).

14

## A.

### *Numerosity*

The first prerequisite under Rule 23(a) is that "the class is so numerous that joinder of all members is impracticable ... ." Fed.R.Civ.P. 23(a)(1). The Sixth Circuit has observed that "[t]here is no strict numerical test for determining impracticability of joinder." *In re: Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 523 n.24 (6th Cir.), *cert. denied*, 429 U.S. 870 (1976)). Furthermore, while "the exact number of class members need not be pleaded or proved, impracticability of joinder must be positively shown, and cannot be speculative." *McGee v. East Ohio Gas Co.*, 200 F.R.D. 382, 389 (S.D. Ohio 2001) (quotation and citations omitted); *see also* 7A Charles Alan Wright and Arthur R. Miller, Mary K. Cane, *Federal Practice and Procedure* § 1762 (3rd ed. 2001) (observing that the party seeking class certification "bear[s] the burden of showing impracticability and mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)"). Finally, the district court must engage in a "rigorous analysis" when evaluating the plaintiff's proof of numerosity. *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982).

Here, plaintiffs seek certification of a class consisting of all customers of the Union County Branch of FCB whose identities or financial information were

15

used by bank employees without their permission during the period from January 1, 1998, to the present. Plaintiffs contend that the potential number of class members is equal to the number of customers at that branch of FCB since January 1, 1998. While the plaintiff class speculates that this number "exceeds 100" [*see* Doc. 41, p.8], plaintiffs offer no proof as to how many of FCB's customers actually fall into the proposed class, which again would consist only of those customers who suffered damages from improper transactions. Absent such proof, this court is reluctant to certify this case as a class action.

In support of this finding, the court relies in part on the recent case of *Golden v. City of Columbus*, 404 F.3d 950 (6th Cir. 2005). In *Golden*, plaintiff sought certification of a class consisting of tenants in Columbus, Ohio, who had suffered equal protection violations when the City terminated their water service without a rational basis to do so. *Id.* at 966. While plaintiff offered evidence that there were 150,000 renters in the City, he offered no evidence - other than "bare speculation" - as to how many of them had had their service wrongfully terminated. *Id.* The Sixth Circuit upheld the district court's denial of class certification, holding that the use of the total tenant population was too speculative to meet the numerosity requirement. *Id.; see also Siles v. ILGWU Nat. Retirement Fund*, 783 F.2d 923, 930 (9th Cir. 1986) (in action alleging wrongful denial of pension benefits, Rule 23(a)(1) was not satisfied by a showing that 31,000 potential class members had lost their jobs in

16

1974 and 1975; plaintiffs had to produce evidence as to how many employees did

not receive a pension, how many worked ten years in covered employment, or how

many did not work a year in covered employment after 1976). In this case, plaintiffs

are similarly asking the court to speculate as to how many of the bank's customers

were defrauded over a period of seven years. This speculation does not satisfy Rule

23(a)(1).


Moreover, in view of the notice already provided by FCB to its customers

as outlined in Ms. Love's affidavit, the court agrees with FCB that it is "highly

unlikely" that there are many remaining members of the proposed class who have

not already come forward.[8] To reiterate, FCB's exhaustive investigation and

contacts with customers show that of the 747 loans open at the branch at issue in

August 2004, only 36 were alleged by the borrowers to involve improprieties. Of the

209 "Mighty Oak" accounts, only seven customers have alleged improper

transactions. FCB has, according to Ms. Love's affidavit, reimbursed its customers

for all losses and has corrected all affected credit reports with the exception of some

---

[8]Upon inquiry by the court during oral argument, plaintiffs' counsel could only identify two other potential plaintiffs, Steve and Judy Sexton. Given the outstanding job that plaintiffs' counsel has performed to date in this litigation, such a dearth of potential plaintiffs confirms the court's view that nearly all of the potential plaintiffs in this case have already come forward. Additionally, the court takes judicial notice of the fact that *The Knoxville News Sentinel* published an article on this very lawsuit on the front page of its Business Section (Section C) on July 21, 2005. The court suspects that this newspaper article will further "flush out" any remaining FCB customers arguably harmed by these unauthorized banking transactions.

17

matters involving these plaintiffs. Presumably, the customers who did not respond to FCB's inquiries about their loans or accounts have no complaint. Additionally, FCB has received no complaints from customers with loans that were paid off before August 2004, and it has received no complaints about erroneous credit reports, other than from the plaintiffs in this consolidated case.

Finally, the court is of the opinion that most, if not all, of any such class members would presumably be located in a limited geographical area, *i.e.*, Union County. That said, joinder as to any potential plaintiffs in the future would be relatively easy. The court finds, therefore, that plaintiffs have not carried their burden of proving that joinder of all members would be impracticable. Consequently, the first requirement of Rule 23(a)(1) has not been satisfied.

## B.

### *Commonality*

The second threshold requirement that plaintiffs must meet is that there be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Although Rule 23(a)(2) is couched in terms of "questions", there need be only one question common to the class to satisfy this requirement. *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (citing *Am. Med. Sys.*, 75 F.3d at 1080)).

18

Nevertheless, the Sixth Circuit has held that not every common question will satisfy this part of the rule: "It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What we are looking for is a common issue the resolution of which will advance the litigation." *Id.* In *Sprague*, the Sixth Circuit held that class certification was improper under Rule 23(a)(2) where the claims of each class member required individualized proof of the defendant's transactions with, or representations to, each member. *Id.* at 398.

In this case, plaintiffs allege that class members were damaged by a variety of unauthorized or fraudulent banking transactions including forgery, fraudulently obtained loans, conversion of assets, and identity theft. In the court's view, proof of defendants' liability, if any, to a particular class member will hinge on the particular facts of the alleged unauthorized loan, balance transfer or other transaction affecting that particular member and only that particular member.

There is another problem in this action which is not present in many cases which have received class certification. Here, plaintiffs have not sued one corporate defendant responsible for a single course of conduct; rather, they have sued four defendants, three of whom are individuals. Consequently, the liability of these defendants may very well differ. The Sixth Circuit recently noted this

19

difference in *Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004), distinguishing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988), a case heavily relied on by plaintiffs in this action. As the *Ball* court observed, *Sterling* stands for the proposition that "'where the [one] defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.'" *Ball*, 385 F.3d at 728 (citing *Sterling*, 855 F.2d at 1197). However, where there are multiple defendants with presumably differing liability levels, "there is no 'single course of conduct.'" *Id.* (citing *Sterling*, 855 F.2d at 1197). For these same reasons, there is no single course of conduct in this case so that plaintiffs have not demonstrated to the court's satisfaction that a meaningful commonality exists.

## C.

### *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class ... ." Fed.R.Civ.P. 23(a)(3). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so goes the claims of the class." *Sprague*, 133 F.3d at 399. In *Sprague*, the Sixth Circuit held that class certification was improperly granted where

20

each class member's claim would depend on the particular facts of his transactions with defendant. A similar result was reached by the Sixth Circuit in *Stout v. J.D. Byrider*, 228 F.3d 709 (6th Cir. 2000). There, the Sixth Circuit upheld denial of a class consisting of persons allegedly defrauded when the defendant sold them vehicles with concealed damage because proof of defendant's liability to each member would depend on the particularized facts of defendant's transactions with that member. *Id.* at 717. Likewise, in the instant case, defendants' liability, if any, to a particular class member will depend on the facts of each transaction.

There are also several other reasons why the claims of the named plaintiffs in this case are not typical with the claims of the proposed class members. First, all of the plaintiffs, except for the Nicelys, are relatives of defendant Connie Dyer. FCB, as indicated earlier, has filed counter-claims against the Smith plaintiffs based on their receipt of funds embezzled from FCB and based on, according to FCB, their "apparent complicity with defendant Connie Dyer ... ." [*See* Doc. 45, p.14]. These circumstances, standing alone, clearly disqualify them from being typical claimants.

Furthermore, with the possible exception of the Grays and the Nicelys, plaintiffs have suffered no monetary loss from any action by defendants. The Grays' claim is also tenuous based on Mr. Gray's admission that the funds they allegedly

21

lost did not belong to them. Moreover, FCB, according to the affidavit of Ms. Love, has corrected all erroneous credit information when plaintiffs have sworn that the loan in question was unauthorized. Consequently, plaintiffs cannot represent a class seeking relief to which they are not entitled or which they have already obtained. *See Cash v. Swifton Land Corp.*, 434 F.2d 569, 571 (6th Cir. 1970) ("The claims of the named plaintiffs, the Cashes, for injunctive relief having been satisfied, '[t]hey cannot represent a class of whom they are not a part.'") (citations omitted). Thus, the court finds that the claims of the named plaintiffs are not typical of those in the proposed class.

## D.

### *Adequate Representation*

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The Sixth Circuit has established two criteria for determining adequacy of representation: "1) The representatives must have common interest with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *Senter v. Gen. Motors Corp.*, 532 F.2d at 525.

22

The first criterion, that of common interest, essentially requires that there be no antagonism of interest or conflict of interest between the representative plaintiffs and the other members of the class they seek to represent. *In re: Medical Sys.*, 75 F.3d at 1083. The second criterion concerns the competency of counsel. *Id.* The Sixth Circuit has stated that the adequacy of representation prerequisite overlaps with the typicality requirement because "in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Id.*

In this case, the court concludes that the named plaintiffs would not be adequate class representatives for the very same reasons that their claims are not typical. Thus, this requirement is not met.[9]

Consequently, because plaintiffs have not satisfied any of the necessary prerequisites of Rule 23(a) for class certification, their motion to do so must be denied.

Order accordingly.

_____ *s/ James H. Jarvis* _____
UNITED STATES DISTRICT JUDGE

---

[9]The court would state for the record, however, that it has no reservation whatsoever in finding that these plaintiffs do have qualified counsel who would be able to manage a class action of this magnitude. However, qualified counsel, even extremely qualified counsel, is simply not enough to carry the day on this particular prerequisite.

23