IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


BOYD SMITH, NANCY SMITH,　　　　）
JOEY SMITH, JEFFREY SMITH,
JILL SMITH, BESSIE HACKNEY,　　　）
WILLIAM GRAY, PEGGY GRAY,
GREGORY HOUSTON, ERNEST　　　　）
NICELY, and PATRICIA NICELY,

　　　　　　　　　　　　　　　　　　）

　　　　Plaintiffs

　　　　　　　　　　　　　　　　　　）

　　　　　　v.　　　　　　　　　　　　　　　　　　　　No.  3:04-cv-591

　　　　　　　　　　　　　　　　　　）

FIRST CENTURY BANK, CONNIE
DYER, SHERI LAWSON, and　　　　　）
DELORIS GRAVES,

　　　　　　　　　　　　　　　　　　）

　　　　Defendants

　　　　　　　　　　　　　　　　　　）

and

　　　　　　　　　　　　　　　　　　）

FIRST CENTURY BANK,

　　　　　　　　　　　　　　　　　　）

　　　　Counter-Plaintiff

　　　　　　　　　　　　　　　　　　）

　　　　　　v.

　　　　　　　　　　　　　　　　　　）

BOYD SMITH, NANCY SMITH,
JOEY SMITH and JEFFREY SMITH,　）

　　　　Counter-Defendants　　　　）

# MEMORANDUM OPINION

This now consolidated action was filed as the result of allegedly fraudulent activity by defendant First Century Bank (FCB) and four of its former employees, defendants Connie Dyer, Sheri Lawson, Deloris Graves, and Karen Williams[1] [*see* Doc. 193]. Very generally, plaintiffs allege that these defendants, without permission, used plaintiffs' identities and/or financial information to issue loans, obtain credit, transfer funds, transfer property interests, and undertook other financial transactions during the period from early 1992 through early 2004. This action seeks compensatory, punitive and statutory damages, as well as injunctive and equitable relief, pursuant to federal and state law as follows:

    (1)    Violation of the Racketeer Influenced and Corrupt Organizations Act (civil RICO), 18 U.S.C. §§ 1961, *et seq.* (Count I);

    (2)    Violation of the federal Consumer Credit Protection Act, 15 U.S.C. § 1681s-2 (Count II);

    (3)    Violation of federal statutes and regulations to protect the confidentiality of consumer information (Count III);

    (4)    Violation of the Tennessee Identity Theft Deterrence Act of 1999, Tennessee Code Annotated §§ 47-18-2001, *et seq.* (Count IV);

---

[1]Defendant Williams was dismissed by memorandum opinion and order filed on July 6, 2005 [*see* Docs. 42 and 43].

(5)     Violation of the Tennessee Consumer Protection Act, Tennessee Code Annotated §§ 47-18-101, *et seq.* (Count V);

(6)     Violation of the Tennessee Financial Records Privacy Act, Tennessee Code Annotated §§ 45-10-101, *et seq.* (Count VI);

(7)     Breach of fiduciary duty (Count VII);

(8)     Conversion (Count VIII);

(9)     Negligence (Count IX);  and

(10)    Violation of the federal Consumer Credit Protection Act, 15 U.S.C. §§ 1601, *et seq.* (Count XI).[2]

This matter is presently before the court on FCB's motion for partial summary judgment with respect to the civil RICO counts (Counts I) of the [corrected] consolidated amended complaints (amended complaints).[3]  The issues raised have been well briefed by the parties [*see* Docs. 206-1, 222, 230, 233 (filed under seal), and 234;  *see also* Docs. 223, 224, and 225 (all filed under seal)].  For the reasons that follow, FCB's motion will be granted, the court finding that there is no genuine issue of material fact regarding the existence of a RICO enterprise or RICO conspiracy set forth in this record so that summary judgment must be entered not

---

[2]Count X seeks equitable relief only and therefore does not allege a particular cause of action.

[3]Count 1 of the amended complaint filed by plaintiffs Boyd Smith, Nancy Smith, Joey Smith, Jill Smith, Bessie Hackney, William Gray, Peggy Gray, and Gregory Houston is set forth at pp.78-92, and Count 1 of the amended complaint filed by plaintiffs Ernest and Patricia Neely is set forth at pp.127-41.

only in favor of FCB but also in favor of all other defendants with respect to the civil RICO cause of action brought by plaintiffs. Moreover, because there are no other federal causes of action pending against the individual defendants aside from civil RICO, this court will decline to exercise supplemental jurisdiction over plaintiffs' state law claims against the individual defendants and those claims will be dismissed without prejudice.

I.

Boiled down to its essential elements, the civil RICO count in both amended complaints is that defendants Connie Dyer, Sheri Lawson and Deloris Graves, along with former defendant Karen Williams and other unknown FCB employees, constituted an "association-in-fact" enterprise under RICO and together controlled and operated the Maynardville Branch of FCB as a RICO enterprise. Plaintiffs also allege that FCB itself is a RICO enterprise. More specifically, plaintiffs allege that a hierarchy existed in which defendant Dyer was the leader, defendant Graves was second-in-command, and defendant Lawson and former defendant Williams had control of some activities of the enterprise, but primarily followed the lead of Dyer and Graves. Plaintiffs further allege that defendants Dyer, Graves, and Lawson obtained funds from their racketeering activity and invested them in "their enterprise" [*see* Doc. 193, pp. 86 and 135]; that through their pattern of racketeering activity, they acquired or maintained an interest in or control of FCB, as well as their

4

association-in-fact enterprise; that defendants Graves, Dyer, and Lawson controlled and operated the Maynardville Branch of FCB through a pattern of racketeering activity, along with their association-in-fact enterprise; and that defendants Dyer, Graves and Lawson, along with other FCB representatives including Karen Williams, conspired to engage in racketeering activity and to commit other RICO violations. Plaintiffs allege that FCB, through its managing agents Graves and Dyer, operated its Maynardville Branch through a pattern of racketeering activity, and that FCB became a participant in the RICO enterprise by attempting to conceal all of this fraudulent activity after it was discovered in the summer of 2004.

In Counts I of the amended complaints, plaintiffs bring a cause of action against all defendants based on violations of 18 U.S.C. §§ 1962(a)-(d) pursuant to 18 U.S.C. §1964(c)[4]. Sections 1962(a)-(d), entitled "Prohibited activities" provide:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any *enterprise* which is engaged in, or the activities of which affect, interstate or foreign commerce. ...
>
> (b) It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain,

_____

[4]Section 1964(c) of RICO gives individuals a private right of action with recourse to treble damages and reasonable attorney fees.

directly or indirectly, any interest in or control of any *enterprise* which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c)     It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such *enterprise's* affairs through a pattern of racketeering activity ... .

(d)     It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

(Emphasis added).  Each of the above subsections, among other things, requires that plaintiffs prove the existence of an enterprise.

RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Thus, an enterprise can be either a legal entity, such as a corporation, or an association-in-fact.  *See Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995) (citation omitted).  Without question, a bank such as FCB is a legal entity which could be an enterprise under civil RICO.[5]  In

---

[5]However, FCB cannot, under 18 U.S.C. § 1962(c), be both the "enterprise" and the "person" conducting or participating in the affairs of that enterprise.  *See, e.g., Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1489 (6th Cir. 1989).  "Under the 'non-identity' or 'distinctness' requirement, a corporation may not be liable under section 1962(c) for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members.  *Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000).  "An organization cannot join with its own members to undertake regular corporate activity

*United States v. Turkette*, 452 U.S. 576 (1981), the Supreme Court defined an

association-in-fact as "a group of persons associated together for a common

purpose of engaging in a course of conduct." 452 U.S. at 583. Here, plaintiffs allege

four separate groups as the enterprise: (1) FCB; (2) the Maynardville Branch of

FCB; (3) the Maynardville Branch of FCB as well as an association-in-fact of

employees Dyer, Graves, Lawson and Williams; and (4) an association-in-fact of

Dyer, Lawson, Williams and Graves as well as other unknown FCB employees [*see*

Doc. 193, pp.78-79].[6] The existence of an enterprise "is proved by evidence of an

---

and thereby become an enterprise distinct from itself." 214 F.3d at 781 (citing *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir. 1982)). Because plaintiffs allege in their amended complaint that FCB is, in effect, participating in the affairs of an enterprise that consists only of its own agents or employees, plaintiffs have failed to state a cause of action under § 1962(c) against FCB. Consequently, even if this court were not inclined to grant FCB's motion for partial summary judgment, the court would, for that reason alone, grant that prong of FCB's motion to dismiss with respect to subsection (c) of the civil RICO statute.

[6]In their response, plaintiffs contend, relying on the plain language of the statute (18 U.S.C. § 1961(4)), as well as an old Fifth Circuit case, *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir.), *cert. denied*, 439 U.S. 953 (1978), that Dyer as an individual can constitute an entire enterprise. However, this court soundly rejects the completely unrestricted view of an individual as an enterprise espoused by cases such as *Elliott*. As one treatise has observed:

> It is significant that the term "individual" is placed in a series of entities that connote legitimate businesses. The only way to make sense of the "individual" as enterprise is by interpreting it to refer to a business operated as a sole proprietorship. A single person criminal enterprise, a lone bank robber for example, is "an absurd notion."

David B. Smith and Terrance G. Reed, *Civil RICO,* § 3.07[3] (1987) (quoting Tarlow, *RICO Revisited*, 17 Ga. L. Rev. 291, 345 (1983)). This court is also unaware of any authority in the Sixth Circuit embracing the unrestricted view of the Fifth Circuit that an individual can constitute an enterprise nor have plaintiffs directed the court's attention to any such

ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.*

> To constitute a RICO enterprise, an association-in-fact:
>
> (1)     must be an on-going organization;
>
> (2)     its members much function as a continuing unit; and
>
> (3)     it must be separate from the pattern of racketeering activity in which it engages.

*Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir. 1993) (per curiam) (citing *Turkette*); *see also United States v. Davidson*, 122 F.3d 531, 534 (8th Cir. 1997) (*Turkette* factors include "whether the alleged enterprise has some common or shared purposes, some continuity of structure and personnel, and a structure distinct from that inherent in the alleged pattern of racketeering activity"), *cert denied*, 523 U.S. 1033 (1998). The "ongoing organization" requirement is co-extensive with the existence of an organizational structure.

> To satisfy [the ongoing organization] element, the [plaintiff] must show that some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual. There must be some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis. This

_____

authority.

does not mean that every decision must be made by the
same person, or that authority may not be delegated.

*United States v. Riccobene*, 709 F.2d 214, 222 (3rd Cir. 1983), *overruled on other*

*grounds*, *Griffin v. United States*, 502 U.S. 46 (1991).  Structure is "[t]he hallmark of

an enterprise."  *United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996) (citation

omitted), *cert. denied*, 519 U.S. 999 (1996).  "An enterprise cannot simply be the

undertaking of the acts of racketeering, neither can it be the minimal association

which surrounds these acts."  *United States v. Bledsoe*, 674 F.2d 647, 664 (8th Cir.),

*cert. denied*, 459 U.S. 1040 (1982).  As the Sixth Circuit has recently observed:

> The district court correctly recognized that the [elements of
> an association-in-fact] have been interpreted to require a
> certain amount of organizational structure which eliminates
> simple conspiracies from [RICO's] reach.  That is, simply
> conspiring to commit a fraud is not enough to trigger
> [RICO] if the parties are not organized in a fashion that
> would enable them to function as a racketeering
> organization for other purposes.  Plaintiffs' brief agrees,
> noting that the "hallmark of a RICO enterprise is its ability
> to exist apart from the pattern of wrongdoing."

*VanDenBROECK v. Commonpoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir. 2000).

In their amended complaint, plaintiffs have attempted to "flesh-out" this

organizational structure by alleging an elaborate conspiracy in which defendants

Dyer, Graves, and Lawson, along with former defendant Williams, operated the

Maynardville Branch of FCB as a criminal enterprise and also conducted the criminal enterprise as a group of individuals associated in fact. Plaintiffs further allege that the criminal enterprise had a chain of command in which defendant Dyer was the leader, defendant Graves was second-in-command, and defendant Lawson and Karen Williams followed their lead. It must be noted too that this alleged hierarchy did not follow the actual structure of the Maynardville branch of FCB. There, defendant Graves was the Branch Manager and defendant Dyer was the Assistant Vice-President and Chief Loan Officer, which position was below the Branch Manager.

In support of its motion for partial summary judgment, FCB strikes at the very heart of this purported organizational structure by filing the affidavit of Connie Hunley, f/k/a Connie Dyer, in which she testifies verbatim as follows:

***

2. I was formerly employed by First Claiborne Bank, which later became First Century Bank. I left my employment with the bank in July 2004.

3. To the best of my knowledge, prior to my leaving my employment at the bank, no officer, director, employee or other person who worked at the bank, other than myself, was aware that I had performed any illegal acts, or that I had performed any transactions in the names of bank customers who had not authorized those transactions.

4.     Prior to my leaving my employment with the bank, I did not inform any bank officer, director, employee or other person who had worked at the bank that I had done any illegal acts or that I had performed any transactions in the names of bank customers who had not authorized those transactions.    To the best of my knowledge, no officer, director, employee or other person who worked at the bank ever knowingly assisted me in doing illegal acts or in performing such unauthorized transactions.

[*See* Doc. 206-2, p.2].  Likewise, at her deposition, defendant Dyer testifies that to the best of her knowledge, defendants Graves and Lawson did not benefit from any of the illegitimate loans or transactions in which Dyer engaged [*see* Doc. 206-3]. Defendant Dyer also testifies that she concealed the illegitimate loans and transactions from defendants Graves and Lawson [*id.*].  Moreover, to the best of defendant Dyer's knowledge, neither defendant Graves nor defendant Lawson knew about any of the illegitimate loans and transactions [*id.*].

The court takes judicial notice of the fact that defendant Dyer entered a plea of guilty on April 19, 2006, before the Honorable Thomas A. Varlan, United States District Judge, to an information charging her with bank fraud arising out of these same facts and circumstances [*see* Docs. 6 and 7 in 3:06-cr-45].  The extent and length of Dyer's illegal activities at the Maynardville branch of FCB is almost incomprehensible.  Among other things, Dyer agreed to the following facts in the Agreed Factual Basis for her guilty plea:

. . .

3.      Dyer, while an assistant branch manager and branch manager of FCB[,] embezzled money then under her custody and control in her capacity as a FCB manager from the checking and savings accounts of FCB customers and used said embezzled funds (a) for her personal benefit, (b) to make payments on fraudulent loans that Defendant fraudulently approved in her capacity as an FCB manager, (c) to conceal her embezzlement of funds embezzled from other FCB customer accounts, and (d) to conceal her violations of FCB policy in approving loans to individuals who did not qualify for such loans under FCB's loan approval guidelines.

4.      From November 13, 2002, through July 12, 2004, Dyer made at least nine (9) unauthorized withdrawals from at least nine (9) different FCB customer accounts. From November 13, 2002, through July 12, 2004, Dyer embezzled at least $309,686.59 from the checking and savings accounts of FCB customers then under her custody and control in her capacity as an FCB manager.

. . .

7.      From March 14, 1997, through July 26, 2004, Dyer, while an assistant branch manager of [FCB] Maynardville, Tennessee, prepared, submitted and approved false and fraudulent loan applications in the names of [FCB] customers without the FCB customers' permission and used the proceeds of those loans (a) for her personal benefit, (b) to make payments on other fraudulent loans that Defendant fraudulently approved in her capacity as a manager of said financial institution, (c) to conceal her embezzlement of funds stolen from FCB customer accounts, and (d) to conceal her violations of FCB policy in approving loans to individuals who did not qualify for such loans under FCB's loan approval guidelines.

8.     From March 14, 1997, through July 26, 2004, Dyer abused her position of private trust by approving in her capacity as an FCB manager at least thirty-nine (39) loan applications that she had fraudulently prepared and submitted to FCB.   In obtaining these fraudulent FCB loans, Dyer used without permission the names and social security numbers of at least nine (9) individuals.   From March 14, 1997 through July 26, 2004, Dyer fraudulently obtained from FCB and directed the use of at least $489,727.48 in fraudulent FCB loan proceeds.

[*See* Doc. 7 in 3:06-cr-45, pp.2,4].  That Agreed Factual Basis also sets forth various mechanisms which Dyer employed to conceal her various illegal activities.  All in all, Dyer agreed that her scheme to defraud FCB resulted in FCB sustaining a loss of $600,000 [*see id.*, p.8].

Based on the information set forth in that Agreed Factual Basis, Judge Varlan sentenced Dyer to a term of imprisonment of 41 months on July 18, 2006 [*see* Doc. 12 in 3:06-cr-45].   It must be further noted that Dyer entered into a cooperation plea agreement with the government in which she agreed, among other things, as follows:

Defendant agrees to cooperate fully, truthfully and completely with any and all law enforcement agents and offices including, but not limited to, the United States Attorney's Office for the Eastern District of Tennessee, in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the

> charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.

[*See* Doc. 6, p.7 in 3:06-cr-45]. Even more significantly, defendant Dyer's plea agreement provides that, if defendant's cooperation rises to the level of "substantial assistance," then the government, in its discretion, could file a motion for downward departure which might generate a sentencing break for this defendant. However, to date, there has been no such motion filed by the government because it appears that defendant Dyer has testified that she acted alone and is therefore unable to implicate anyone else. The court would further note that this defendant's Agreed Factual Basis provides numerous incidents of bank fraud, all of which were undertaken solely by defendant Dyer [*see* Doc. 7 in 3:06-cr-45].

Plaintiffs' response to Dyers' affidavit and her deposition testimony is not surprising. Plaintiffs take the position that it is quite understandable that Dyer would deny being at the helm of a RICO enterprise "because admission of her involvement in such an enterprise would increase her exposure to both civil and criminal liability." [*See* Doc. 222, p.2]. The court vigorously disagrees. It has been the court's experience, during the last 22 years on the federal bench, that a white collar

criminal, such as Dyer, would never fail to identify all other members of a conspiracy, if indeed one exists. In fact, a defendant's full and substantial cooperation is about the only mechanism available if a defendant wishes to receive a significant sentencing break. In other words, if Dyer is withholding information either from the government or from these plaintiffs during her deposition, then this withholding of information about other co-conspirators would be the first time that this court is aware that a white collar defendant has done so.[7]

Thus, plaintiffs cannot prove the existence of a RICO conspiracy or an enterprise with any direct evidence in light of Dyer's testimony that she acted alone and that the remaining two individual defendants had no knowledge of her illegal activities.[8]  *Cf. United States v. Johnson*, 430 F.3d 383, 392 (6th Cir. 2005) (the

---

[7]The court further observes that the notion of being a "stand up" defendant is a more common phenomenon in the context of a drug conspiracy case. There, a defendant will sometimes enter into a non-cooperation plea agreement because of an understandable reluctance to be identified as a government "snitch" prior to federal incarceration. Again, the converse is true with respect to white collar criminal defendants who squeal quickly and loudly.

[8]In her declaration filed in support of her pending motion for summary judgment, defendant Graves similarly testifies that she did not participate or engage in any of the alleged forgeries, fraud and illegal conduct that plaintiffs have alleged in this case; that she received no money, property or other benefit as a result of the alleged forgeries, fraud and unlawful conduct; and that during her employment with FCB, she was not aware, and did not even suspect, that anyone, including defendant Dyer, engaged in any of the alleged forgeries, fraud and unlawful conduct which plaintiffs have alleged [*see* Doc. 171-2]. Defendant Lawson, in support of her motion for summary judgment, simply relies on defendant Dyer's testimony that Lawson did not participate in or benefit from any of the illegal loans or transactions in this case, nor did Dyer tell Lawson about any of her illegal activities [*see* Docs. 203-1 and 203-2].

members of the alleged enterprise considered themselves to be part of a "business" and that "business" was crime; moreover, the members met on an almost-daily basis to discuss their criminal activities). Because plaintiffs have no direct proof of any RICO enterprise, plaintiffs are forced to rely on very sparse circumstantial evidence to establish this purported "chain of command" or other hierarchy. For the reasons that follow, the court finds that this evidence falls woefully short of establishing any ongoing organization, nor does it establish that these individuals functioned as a continuing unit, nor does it establish that the organization was separate from the pattern of racketeering activity in which it engaged. The court will now examine plaintiffs' circumstantial evidence.

Plaintiffs first assert that there is evidence that defendants Graves and Lawson, as well as Karen Williams, signed customers' names to financial documents. Defendant Dyer testifies that Graves signed the names of Graves' two sons to loan documents and that Lawson signed her mother's name to a loan document. Dyer also testifies that Lawson and Graves may have signed a form to complete a transaction if a customer had failed to sign it. There is also testimony that Karen Williams had signed her husband's name to a loan document. Additionally, there is evidence that on one occasion Dyer and Graves had violated FCB's lending policy when Dyer handled a loan to Graves' son; however, no forgery was involved. There is also evidence that Lawson was reprimanded for the method

in which she withdrew money from her mother's savings account, but the withdrawal was with her mother's permission and the reprimand was based on the method of withdrawal - not the withdrawal itself.  In the court's view, this evidence does not even rise to the level of a simple conspiracy, much less a RICO conspiracy which is required to establish an enterprise in a RICO case.  *See VanDenBROECK*, 210 F.3d at 699.  At most, this evidence shows improprieties regarding how defendants Lawson and Graves dealt with family financial matters at FCB.

Plaintiffs have also produced evidence that defendant Graves did not comply with the bank's notary policy because, on occasion, she would notarize customers' signatures on documents without personally observing the customers sign.  Plaintiffs rely heavily on Graves testimony that she did this four or five times.  Nevertheless, Graves testifies that she was confident that each time she notarized a document where she did not actually see the person sign it, the person was in the bank at the time, and she would not have notarized it had she not seen the customer.  Plaintiff Patricia Nicely alleges that her signature was forged on one document which defendant Graves notarized.  Plaintiffs also assert that Graves signed a deed of trust modification as a representative of FCB, and that the customers' signatures on that document were forged.  However, defendant Graves did not notarize those signatures.  Finally, plaintiffs assert that in one instance, Lawson notarized allegedly forged signatures on a modification of deed of trust and

17

that on two occasions Karen Williams notarized signatures that were allegedly forged.

Again, this evidence, in the court's view, does not rise to a sufficient level to establish a complex RICO conspiracy. At best, this evidence rises to ad hoc instances of fraud or perhaps sloppy or negligent banking practices. This evidence does not rise to the threshold level of demonstrating an organization which would enable them to function as a racketeering organization for other purposes. *See VanDenBROECK*, 210 F.3d at 699. This evidence does demonstrate perhaps the minimal association which surrounds the underlying racketeering acts, which is insufficient. *See Bledsoe*, 674 F.2d at 664.

Plaintiffs also rely on a number of instances in which there were transactions in savings accounts held by defendant Lawson and her son and mother, the largest one being $10,000. During her deposition, Lawson testifies that she could not recall the source of the funds nor could she recall them with certainty. Plaintiffs assert that these transactions are evidence from which a reasonable jury could conclude that there was a RICO enterprise and that Lawson was laundering ill-gotten gains through her savings account. Again, however, this inference, even if permitted, would not allow a reasonable jury to conclude that the money was being

generated for the benefit of the so-called enterprise; rather, it would only be generated for the benefit of defendant Lawson.

Plaintiffs next cite evidence that defendant Lawson, or someone using her computer password, prepared a number of loan documents. Plaintiffs allege that their signatures on those documents were forged. The proof indicates that Lawson was employed as a loan processor by FCB and that it was her job to prepare loan documents. The loan officers would give Lawson information such as the terms of the loans, customers' names, etc. Lawson would then type the information into a computer, which would then print the loan documents. Later, the customer would sign the documents. There is no direct evidence that Lawson forged anyone's name on these documents. Plaintiffs do allege, however, that their signatures were forged on a number of loan documents which Karen Williams initialed and on one which she signed. Karen Williams was also a loan processor, and the loan processors would initial documents so that the main office would know whom to call if there were questions about the documents. All of this, of course, was a routine part of the loan processor's job. Additionally, plaintiffs point out that a number of loan checks were made payable to plaintiffs and signed by Lawson, Williams or Graves. Graves also signed a cashier's check payable to plaintiff Patricia Nicely. Plaintiffs claim that their endorsements on the checks were forged or that the checks were negotiated without their permission. Once again, signing loan checks was a routine part of the loan

processor's job and signing checks was also a part of the job of a loan officer such as Graves.

In short, plaintiffs offer no evidence that Graves, Lawson or Williams forged anyone's signature on these documents or knew that the signature was forged. The evidence does show that these bank employees prepared documents that they were routinely required to prepare and sign in the course of their duties as a loan processor (in the case of Lawson and Williams) and a loan officer (in the case of Graves). But even if the court or jury were to read into these inferences everything which plaintiffs suggest, all of this evidence still does not rise to the necessary threshold of demonstrating that there was some sort of RICO enterprise separate from this purported pattern of racketeering activity in which it engaged. All of this evidence points only to the so-called racketeering activity itself, which is insufficient. *See Frank v. D'Ambrosi*, 4 F.3d at 1386.

In an attempt to resurrect the specter of a RICO conspiracy, plaintiffs also highlight the timing and circumstances of the termination of each of the individual defendants. It is undisputed that defendant Dyer was fired by FCB in the latter part of July 2004. Graves had been forced to resign in February 2004 because FCB was concerned that she had overdrafts in her checking account and had a delinquent credit card account. Plaintiffs assert, of course, that based on the

evidence that Graves had financial problems, a reasonable jury could infer that she participated in a RICO conspiracy with Dyer and others to steal money from FCB and its customers. While this evidence might be relevant if plaintiffs were able to establish a RICO enterprise, the court agrees with FCB that it cannot create a RICO conspiracy based on that fact standing alone.

Similarly, the evidence indicates that Karen Williams had resigned several years earlier in November 2001, and there is certainly no evidence to connect her resignation to the existence of a RICO enterprise dedicated to stealing money from FCB and its customers. This is especially true given the fact that this court has already dismissed Karen Williams as a defendant in this case based on the failure of plaintiffs to properly plead a civil RICO cause of action against her [*see* Docs. 42 and 43].

It is also undisputed that Lawson resigned from the bank in July 2004, prior to the termination of Dyer, and took a job with fewer fringe benefits than she had with FCB. Plaintiffs contend that Lawson would not have made such a job change unless she was a participant in a RICO enterprise and therefore resigned to avoid being fired for her participation in that fraudulent scheme. Nevertheless, this inference does not create the existence of any RICO enterprise which is required under all of the statutes relied on by plaintiffs.

Plaintiffs next contend that Dyer's fraudulent activities "were so frequent and over such an extended period of time that the only reasonable inference to be drawn is that other bank employees participated in the transactions or, at a minimum, engaged in 'willful blindness' to allow the scheme to continue." [*See* Doc. 222, pp.3-4]. The court agrees with FCB that a jury may not rely on a defendant's "deliberate ignorance" as the basis for finding that a defendant participated in a conspiracy. "Deliberate ignorance" may be used to prove that a conspirator knew of the unlawful aims of a conspiracy in which he knowingly participated, but "deliberate ignorance" may not be used to prove that the defendant was a member of the conspiracy in the first place. *United States v. Warshawsky*, 20 F.3d 204, 211 (6th Cir. 1994). Consequently, plaintiffs cannot rely on "deliberate ignorance" or "willful blindness" to demonstrate that other FCB employees participated with Dyer in a RICO conspiracy.

Plaintiffs' final argument is that the court should delay any decision on FCB's motion for partial summary judgment until plaintiffs have had an opportunity to conduct more discovery. The record reflects that this case was filed more than two years ago and, according to FCB, more than 20,000 pages of documents have been produced by it. The record further reflects that the depositions of all of the individual defendants have been taken, as well as a number of other witnesses. Plaintiffs' request is also not supported by an affidavit which details the discovery

needed, states what material facts plaintiffs hope to uncover, and explains why plaintiffs have not previously discovered the information. *See* Fed. R. Civ. P. 56(f). Moreover, plaintiffs must explain exactly how obtaining the additional discovery will help rebut defendants' showing of the absence of a genuine issue of material fact. *Gettings v. Building Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 304-05 (6th Cir. 2003) (citation omitted). The court agrees with FCB that plaintiffs have not made a proper showing under either the Federal Rules of Civil Procedure or the case law for additional time.

More importantly, however, the court cannot envision how additional discovery will help plaintiffs with their present difficulty, which is creating a genuine issue of material fact regarding a civil RICO enterprise. The evidence in this case demonstrates that defendant Connie Dyer acted alone. At most, the evidence indicates that defendant Dyer may have involved other employees unwittingly in her various schemes, but that they did so as employees of FCB, not as part of some sort of separate civil RICO enterprise. There is certainly no evidence in this case that these three individual defendants operated as some formal or informal organization or that they functioned as a continuing unit or that their organization was separate from the pattern of racketeering activity in which it engaged. It is, of course, possible that the defendants other than Dyer may also have engaged in some sort of separate fraud involving their own family members and, if that be the case, then

plaintiffs can pursue those causes of action as the evidence dictates. But this evidence does not suggest that these individual defendants operated on anything but an ad hoc basis. Moreover, because these individual defendants do not comprise a separate enterprise, it naturally follows that neither FCB nor the Maynardville Branch of FCB comprises a separate RICO enterprise aside from these employees.

This litigation has been allowed to proceed as long as it has because the court was initially concerned that there might be some sort of civil RICO organization involved, given the unprecedented length of the events at issue at FCB. The court was initially concerned too that there might be "something more" in this case other than mismanagement and oversight by FCB. However, after all of this voluminous discovery has been completed, the notion of a civil RICO conspiracy completely evaporates in light of the record as it has been developed to date. The court concludes that there is no proof in this record to demonstrate "an organizational pattern or system of authority [which] ... provide[d] a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis." *United States v. Kragness*, 830 F.2d 842, 856 (8th Cir. 1987) (citations omitted); *see also Delta Truck and Tractor, Inc. v. J. I. Case Co.*, 855 F.2d 241, 244 (5th Cir. 1988) (finding that alleged racketeering activity was "nothing more than numerous predicate acts which were necessary segments of an otherwise legitimate and singular commercial

endeavor"). Plaintiffs have simply failed, after being given more than ample time, to produce any evidence of a civil RICO enterprise.

II.

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden is on the moving party to conclusively show no genuine issues of material fact exist. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003), and the court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Id.* at 323.

The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question; but does not weigh the evidence,

judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson*, 477 U.S. at 250. The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.; Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

III.

Applying the above standard to the record in this case, the court will grant FCB's motion for partial summary judgment, the court finding that there is no civil RICO enterprise as required to sustain Counts I of the amended complaints. That being the case, Counts I of the complaints must be dismissed not only against FCB but also against all other defendants. Furthermore, because the remaining counts against the individual defendants set forth causes of action under either Tennessee statutes or Tennessee common law, this court will decline to exercise supplemental jurisdiction over plaintiffs' state law claims against the individual

defendants.  *See* 28 U.S.C. § 1367(c)(3).  *See also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

Order accordingly.

_____***s/  James H. Jarvis***_____
UNITED STATES DISTRICT JUDGE